### SLATER *v.* LA GRANDE POWER CO.

[72 Pac. 738.]

ARBITRATION AND AWARD — NOTICE OF MEETING OF ARBITRATORS.

A submission was made to two arbitrators, with power to choose a third. The parties appeared before the two, and made statements of their claims. The two, failing to agree, chose a third, who, without examining the work to be passed on, met with the other two. The arbitrator appointed by plaintiff withdrew without his knowledge, and the others made the award. *Held,* that notice to the parties of the meeting by the three was necessary to give jurisdiction, and, none having been given, and plaintiff not having known that the arbitrator appointed by him had withdrawn, the award was void, though the parties knew the arbitrators were in session after the third was chosen.

From Union: ROBERT EAKIN, Judge.

Suit by J. L. Slater against the La Grande Light & Power Company and others to foreclose a lien. The facts are that

after plaintiff had commenced to furnish the material and to construct a dam in the Grande Ronde River for the defendant under an agreement that he was to receive therefor the sum of $6,300, the plan and specifications were modified, increasing, in some particulars, the labor and material, diminishing the size of the dam, and relieving the plaintiff from filling a crib with rock, it being understood that he was to be paid the reasonable value of the extra labor and material necessitated by the change, and that defendant should be credited with the cost of filling a crib of the dimensions specified in the contract, and also with the value of the material saved by the modifications of the plan. The dam having been completed January 12, 1901, the plaintiff, about three days thereafter, presented a bill therefor, which, omitting details, is as follows:

| | |
|---|---:|
| To contract price of dam | $ 6,300 00 |
| To extras: 33,024 ft. lumber @ $15 per M | 495 00 |
| 876 feet @ $10 per M | 8 76 |
| Labor | 153 50 |
| Drift bolts | 18 75 |
| Driving piling | · 80 00 |
| Total | $ 7,056 01 |
| By 434 cu. yds. stone placed in crib @ 50c per yd. $ | 217 00 |
| 10 cu. yds. placed in apron @ 80c per yd. | 8 00 |
| Lumber saved by change of plan, 4,916 feet, @ $15 per M | 73 74 |
| Cash received | 5,500 00 |
| Balance due | 1,257 27 |
| Total | $ 7,056 01 |

The defendant's agents being dissatisfied with the account rendered, it was orally agreed that all matters outside the original contract should be submitted to arbitrators, one to be chosen by plaintiff, another by the defendant, and, if they could not agree, a third should be selected. In pursuance of such agreement, plaintiff chose C. R. Thornton, and the defendant E. J. Stuart, and, upon their dis-

agreement, J. S. Scranton was appointed, who, in a few days thereafter, met with the others. Thornton soon thereafter, and without plaintiff's knowledge, withdrew, whereupon Stuart and Scranton signed a memorandum, in which they found that there was due from the defendant to the plaintiff the sum of $1,136.16, which he refused to accept, and on March 6, 1901, filed a claim of lien to secure the sum of $1,360.62, and instituted this suit for its foreclosure. The answer admits that the dam was constructed, but denies that the sums demanded for extra labor and material are reasonable, sets up the alleged award, and avers a tender to plaintiff of the sum found by the arbitrators to be due him, which it deposited for him with the clerk of the court. For a further defense the original contract is set out, and it is alleged that under its terms plaintiff was required to drive sheet piling in a specified manner, but that he performed that part of his agreement so negligently that defendant was damaged thereby in the sum of $250. The reply admits the agreement to arbitrate the matters in dispute, avers that plaintiff revoked the submission before any award was published, and denies the other material allegations of new matter in the answer. The cause, being at issue, was referred to H. R. Hanna, who took and reported the testimony, from which the court found the facts, in effect, as hereinbefore stated, and, having concluded, as a matter of law, that the submission and award were valid and binding upon the parties, rendered a decree dismissing the suit, and plaintiff appeals.

REVERSED.

For appellant there was an oral argument by *Mr. Robert J. Slater*, with a brief over the names of *J. D. Slater* and *R. J. Slater* to this effect:

The award is void because the third arbitrator did not hear the statements of the parties and took no evidence in the matter and did not notify either of the parties to be

present and make a statement or produce evidence, and the plaintiff was not present and had no opportunity to make any statement or produce evidence: *Falconer* v. *Montgomery*, 4 U. S. (4 Dall.) 232 ; *Parsons* v. *Pettit*, 4 U. S. (4 Dall.) 27 ; *Day* v. *Hammond*, 57 N. Y. 479 (15 Am. Rep. 522); *Haven* v. *Winnisimmet Co.* 11 Allen, 377 (87 Am. Dec. 723); *Ingraham* v. *Whitman*, 75 Ill. 30; *Elmendorf* v. *Harris*, 23 Wend. 628 (35 Am. Dec. 587); *Bulson* v. *Lohnes*, 29 N. Y. 291 ; *Daniel* v. *Daniel*, 9 Dana, 93 ; *Frissell* v. *Ficks*, 27 Mo. 557 ; *Walker* v. *Walker*, 28 Ga. 140; *Small* v. *Courtney*, 1 Brev. (S. Car.) 205 ; *Coon* v. *Coon*, 95 Va. 434 (64 Am. St. Rep. 804); 3 Cyc. 640.

For respondents there was a brief and an oral argument by *Mr. J. W. Knowles* to this effect:

Unless a parol submission to arbitration is unconditionally revoked before the award is made, it is binding upon the parties even where one of the parties refused to reduce the submission to writing: *Dilks* v. *Hammond*, 86 Ind. 563 ; Notes in 2 Am. & Eng. Ency. Law (2 ed.), p. 597, and cases there cited.

After a question is referred to arbitrators, and they have acted under the reference, one of the parties cannot put an end to the contract and revoke the authority of the arbitrators by an expression of a determination not to stand by the agreement. Such declarations are nugatory unless the party expressly revokes the authority of the arbitrator: *Brown* v. *Welcher*, 1 Cold. (Tenn.) 197.

After an award is once made the submission cannot be revoked by either without the other's consent: *Union Ins. Co.* v. *Central Trust Co.* 13 N. Y. Supp. 17 ; 2 Am. & Eng. Ency. Law (2 ed.), p. 597 ; *Toby* v. *Preston*, 3 Story, 800.

MR. CHIEF JUSTICE MOORE, after stating the facts in the foregoing terms, delivered the opinion.

It is contended by plaintiff's counsel that their client

having no notice of the time and place of hearing before the arbitrators after Scranton's appointment, and not having waived his right to appear before them and offer his evidence, any conclusion they may have reached in respect to the sum due either party is void, and, this being so, that the court erred in dismissing the suit, and in not foreclosing the lien for the sum prayed for in the complaint. The transcript fails to show that any notice was ever given to the plaintiff of the time and place of hearing before the three arbitrators, or that he ever in any manner waived the right to be heard, though he knew they were in session after Scranton met with the others, but did not know that Thornton had withdrawn until the award had been made by the other two. The plaintiff and the defendant's agents went before Thornton and Stuart prior to their disagreement, and made statements concerning their respective claims against each other; but neither party appeared or offered any evidence after Scranton was selected. Thornton being an architect, Stuart a mechanic, and Scranton a millwright, it might reasonably seem to be inferred from their several qualifications that they were selected because of their peculiar knowledge of the matters submitted to them, so that a hearing was thus made unnecessary (Morse, Arb. p. 143; *Stemmer* v. *Scottish Ins. Co.* 33 Or. 65, 49 Pac. 588, 53 Pac. 498 ; *Wiberly* v. *Matthews*, 91 N. Y. 648); but, as the parties appeared before and made statements of their respective demands to Thornton and Stuart prior to their disagreement, any inference that might seem to be deducible from the special qualifications of the abitrators is dispelled. This conclusion is strengthened by the fact that Scranton never inspected the work so as to qualify himself to determine the reasonable value of the labor performed or material furnished, for on cross-examination, in answer to the question, "Did you go up there and examine that dam ?" he

said, "No, sir; I have been over the dam two or three times, but never went to examine it." In *Falconer* v. *Montgomery*, 4 U. S. (4 Dall.) 232, a submission having been made to two arbitrators with power to choose an umpire if they disagreed, an umpire was appointed, who received a statement of the case from the arbitrators, in the absence of the parties, and without giving them a hearing, and it was held that the award should be set aside; the court saying: "The plainest dictates of natural justice must furnish to every tribunal the law that 'no man shall be condemned unheard.' It is not only an abstract rule or positive right, but it is the result of long experience and of a wise attention to the feelings and dispositions of human nature."

The rule in this country is quite general that, in the absence of any stipulation of the parties regulating the matter, the duty of giving notice of the time and place of hearing upon the submission of a controversy devolves upon the arbitrators, but the manner of giving it, so long as it is reasonably adequate to accomplish the purpose for which it was designed, rests largely in their discretion: Morse, Arb. p. 118. In *Wood* v. *Helme*, 14 R. I. 325, a dispute concerning a building contract was submitted to two arbitrators under a stipulation that, if they could not agree, they were to choose a third, the decision of any two of them to be final. A disagreement having occurred, a third arbitrator was chosen, who, in company with one of the others, visited the premises, and heard *ex parte* statements from the defendant's brother concerning the matter submitted, in the absence of the plaintiffs, and without notice to them. An award having been made, it was set aside as void, the court, in speaking of the duty of arbitrators under a submission silent in respect to notice, saying: "Without question it was the duty of the arbitrators, under the submission in this case to give due notice to the parties

of the time and place of hearing the cause before proceed-
ing therein." Further in the opinion it is said : "And it
makes no difference in this respect that there has been a
regular hearing in the case before the two arbitrators origi-
nally chosen, who were unable to agree, and thereupon
called in a third person ; for the proceeding then com-
mences *de novo*, and the parties are entitled to the same
notice as though no proceeding had been previously had."
In *Day* v. *Hammond*, 57 N. Y. 479 (15 Am. Rep. 522), a
controversy was submitted to two arbitrators in pursuance
of like terms, and, a disagreement having resulted, a third
arbitrator was chosen, who, with one of the others, made
an award without hearing the parties, and it was held that
the failure to have a rehearing upon due notice to them
rendered the award invalid, the court saying: "There is
no necessity to take proceedings in equity to set the award
aside." In the case at bar the plaintiff never received any
notice from the arbitrators, after Scranton was appointed,
of the time or place of hearing, though he knew they were
in session in the office of the defendant company. He had
no knowledge, however, that the arbitrator selected by him
had withdrawn, or refused to consider the matters sub-
mitted to him and his associates. The right to hear and
determine the subject-matter in proceedings of this char-
acter is conferred by the submission, while jurisdiction of
the parties, in the absence of any stipulation, prescribing
the time and place of hearing, or of any waiver thereof, is
secured by notice to them from the arbitrators. Thornton
and Stuart having failed to agree, Scranton, upon being
selected and accepting the appointment, *ipso facto* became
a member of a new board of arbitrators, the hearing be-
fore whom was a trial *de novo* upon the merits of the
controversy : *Wood* v. *Helme*, 14 R. I. 325. True, the plain-
tiff knew the arbitrators were in session when Scranton
undertook the performance of the duty incident to an

acceptance of his appointment, but, as he assumed that he was being represented by Thornton, who, without his knowledge, withdrew from the conference, and as jurisdiction of the person is secured by notice of some character, emanating from the arbitrators, their failure to notify him of the time and place of the rehearing, so as to afford him an opportunity to introduce his evidence and to make an argument in support thereof, if he so desired, renders the award void, and, this being so, it may be challenged in a collateral proceeding when an opportunity offers, such as this suit affords: *Day* v. *Hammond*, 57 N. Y. 479; *Elmendorf* v. *Harris*, 23 Wend. 628 (35 Am. Dec. 587). Having reached the conclusion that the award is void for lack of notice, it is unnecessary to consider other reasons assigned by plaintiff's counsel as grounds for setting it aside.

Having found that the court erred in dismissing the suit, there remains to be ascertained the amounts due the plaintiff for the extra labor and material necessitated by a change in the plans and the credits to which the defendant is justly entitled for causing the rock to be furnished for the crib, the value of the material saved by reducing the size of the dam, and the damage, if any, that it sustained in consequence of the manner of driving the sheet piling. It will be remembered that the bill presented by plaintiff to the defendant shows that the extra lumber used was 33,024 feet and 876 feet, at $15 and $10, respectively, per M, amounting to $503.76, an undervaluation of 36 cents. The quantity specified in the complaint, as evidenced by the notice of lien, is stated to be 16,936 feet, at $15 per M, which sum is made up as follows: $10 per M for the lumber, $3.50 per M for the labor, and $1.50 per M for the nails and drift bolts used in putting the material in place, or $254.04; 15,360 feet at $16.75 per M, this amount being $11.35 per M for the lumber, $3.50 per M for the labor employed, and $1.90 per M for the nails and

drift bolts used therein, or $274.03 — evidently an erroneous overcharge of $16.75; and 1,604 feet at $10 per M, or $16.04 — making in all the sum of $544.11, a difference of $40.35 between the bill as rendered, in respect to this item, and the sum demanded in the complaint. The following items stated in the complaint do not appear in the bill rendered, to wit: To excess of rock in pier, 120 cubic yards, at 50 cents per yard, $60, and to sizing timber for flood gates, $3, thus claiming the sum of $103.35 in excess of the original bill. The plaintiff, as a witness in his own behalf, testifies that the charge of $15 per M in the bill as originally rendered was made for the extra lumber used, and was intended to include the item of 15,360 feet of that material for which he now demands $16.75 per M; saying: "This bill was put in in the attempt to get a settlement as a sort of a compromise. There was a chance for a difference between us. I made out that bill, and made it just as low as I possibly could, and gave it in to them." He says, however, that prior to presenting it there had been no dispute concerning any item thereof. He further testifies that he gave the defendant credit for 434 cubic yards of stone at 50 cents per yard, which it caused to be placed in a pier, this being 120 cubic yards in excess of that to which it was entitled, thus crediting it with $60 too much by mistake, for which he should have credit. The original contract provided for the construction of a pier 64 feet long, 4 feet wide, and 24 feet high, but by the modified agreement it was built 44 feet long, 14 feet wide, and 24 feet high, using timbers 10 inches thick and having 5 cross-tiers, which required 434 cubic yards of rock to fill, or 120 cubic yards in excess of that necesasry to fill a pier of the dimensions prescribed in the original specifications. The plaintiff, on cross-examination, in speaking of his reasons for omitting this $60 charge, says, "Well, I left it out partly because I overlooked it, and

partly because I wanted to keep the bill to get a settlement." The plaintiff, explaining the charge of $3 for readjusting timbers used in the flood gate, testifies as follows: "They had plans drawn for certain kinds of lifts, but when the irons came they required different sized timbers, so I sized them down by hand, and charged them for it." In explaining how he omitted this item from the original bill, he says: "I overlooked it. I told Mr. Palmer (the president and general manager of the defendant company) that there was other things I was entitled to. Q. You didn't keep that sum out to save a law suit? A. I kept it out to try and get a settlement." The plaintiff further testifies that the charges on account of the several items specified in the notice of lien and demanded in the complaint, together with the credits to the defendant, are reasonable, and that there is due him from it, over and above all payments and credits, the sum of $1,343.37.

The specifications prescribing the kind of material to be furnished and the character of work to be performed in constructing the dam were in typewriting, one clause of which is as follows: "Planking and sheathing to be tamarack, two thicknesses, 2x12, laid to break joints on the face ribs of the dam cribs and apron and spiked thereto." A punctuation mark in the language quoted is made with graphite, and the plaintiff, referring thereto, says: "The comma in pencil has been put in between the two words 'dam' and 'cribs' since these specifications left my hands, if these are the same ones." E. J. Stuart, as defendant's witness, speaking of this clause, and also referring to plaintiff's bill, as rendered, for 1,400 feet and 1,650 feet of 1x12-inch lumber used on the north and south piers of the dam, respectively, for which a charge of $15 per M is made, says that this material was not extra, and plaintiff was required to furnish it at his own expense, under the terms of the contract. The testimony of this witness is

corroborated by that of Joseph Palmer and W. G. Masterton. It would seem to be implied from the absence of the comma in the clause quoted that under the specifications, as originally prepared, the piers were not to be sheathed, and that a distinction is made between the words "piers" and "cribs;" the latter only, when forming a part of the dam, to be planked under the contract, though Masterton says the words are synonymous. If this be so, the comma must have been inserted in the specifications when the contract was entered into; but we think from plaintiff's testimony that the change was made therein afterwards, and for this reason he will be allowed compensation for this lumber as extra material.

It will be remembered that plaintiff seeks to recover $15 per M for 16,936 feet, $16.75 per M for 15,360 feet, and $10 per M for 1,604 feet of extra lumber furnished, the prices respectively demanded therefor including the cost of the lumber, nails, and drift bolts, and also the value of the labor employed in placing the material in the structure. Stuart and Scranton estimate the reasonable value of the lumber so used, including nails, drift bolts, and labor, at $14 per M. The plaintiff, testifying in relation to the charge of $16.75 per M, says that in changing the pier from 4 to 14 feet in width he was obliged to use 16-foot timbers which he had ordered, and could not secure material therefor that was of the proper length, thereby causing a waste, for which he made the extra charge of $1.35 per M. We think the preponderance of the testimony shows that the reasonable value of the material furnished was only $14 per M, including nails, drift bolts, and labor, and this sum will be awarded for 32,296 feet, and $10 per M, the sum demanded, for 1,600, an error of 4 feet having been made in the computation as set forth in the complaint. The waste claimed, as we understand the matter, is not so much as stated. There are five cross-

tiers, 14 feet long, in the pier as changed, and if material 16 feet in length were used, there would be a waste of 2 feet. The timber used was laid 10 inches thick, thereby causing a waste of 2,400 feet, for which an allowance of $24 is made in addition to the above.

It will be remembered that the sum demanded for driving the piling is $80. We think the weight of the testimony shows that the reasonable value of this work was only $56, which sum will be allowed therefor. For the extra drift bolts furnished, $18.75, and the value of the extra labor employed, $353.50, and for sizing the timber for the flood gate, $3, will be allowed on said items respectively. The defendant is credited with 434 cubic yards of stone placed in a pier at 50 cents per cubic yard, or $217, and plaintiff, in the complaint, makes a counter charge of 120 cubic yards at the same price, or $60. The defendant should only be credited with filling a pier 64 feet long, 4 feet wide, and 24 feet high, the dimensions of the one agreed to be filled by plaintiff, or 314 yards. We think the weight of the testimony shows that the reasonable value of this work was 75 cents per cubic yard, which sum will be awarded therefor.

The contract required plaintiff to drive in the bed of the river a row of sheet piling, the top part of which was to be spiked to the dam, and it is alleged in the answer that this work was so carelessly done that defendants were damaged thereby in the sum of $250. The witness J. D. McKennon, in answer to the question as to how much damage defendant sustained in this respect, testifies as follows : "That is a hard question to answer. We cannot really estimate the damage that that has done us by reason of their not being driven according to the plans and specifications. It has cost a great deal of money to stop the leaking, which is certainly caused by reason of the fact that the piles are not driven close together. It does not

stop the flow as it would have if they had been driven in a perfect line according to the plans and specifications." The witness Joseph Palmer, in answer to a similar question, says: "Well, I could not possibly estimate the damage — how much it is. We have no water in the summer time on account of the leakages." We think this evidence too indefinite to base any conclusion thereon in respect to the amount of damage sustained by the defendants, and hence the claim therefor will be disallowed.

It is stated in defendants' brief, and not controverted at the trial, that plaintiff secured from the county clerk the sum of $1,136.16, deposited for him. This being so, the account will be recast as follows :

| | | |
|---|---:|---:|
| Contract price of dam | $ 6,300 | 00 |
| To 32,296 ft. extra lumber (@ $14 ℙ M | 452 | 14 |
| 1,600 ft. extra lumber (@ $10 ℙ M | 16 | 00 |
| Waste | 24 | 00 |
| Labor | 153 | 50 |
| Drift bolts | 18 | 75 |
| Driving piling | 56 | 00 |
| Sizing gate | 3 | 00 |
| Total | $ 7,023 | 39 |
| By 314 cu. yds. stone (@ 75c ℙ cu. yd. | $ 235 | 50 |
| 10 cu. yds. (@ 80c. | 8 | 00 |
| Lumber saved, 4,916 feet, (@ $14 ℙ M | 68 | 82 |
| Cash paid | 5,500 | 00 |
| Cash deposited | 1,136 | 16 |
| Balance due | 74 | 91 |
| Total | $ 7,023 | 39 |

This shows that plaintiff is entitled to recover the sum of $74.91, and the further sum of $1.50 which the testimony shows he paid for filing the lien. The decree of the court below will therefore be reversed, and one entered here foreclosing the lien for the sum so found to be due.                                        REVERSED.